**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MADALYN THOMAS,** a minor, by her parent and natural guardian, **JASON THOMAS,** and in his own right, | : : : : | |
| **Plaintiffs,** | : : | **CIVIL ACTION** |
| **v.** | : : | **NO. 09-3771** |
| **STAPLES, INC. and EXECUTIVE MACHINCES, INC. d/b/a JEAM IMPORTS,** | : : : : | |
| **Defendants/Third Party Plaintiffs.** | : : | |
| **v.** | : : | |
| **JASON and AMY THOMAS,** | : : | |
| **Third-Party Defendants.** | : : : | |

**MEMORANDUM OPINION**

Tucker, C. J.                                                          **March 4, 2014**

Presently before the Court is Defendants Staples, Inc. and Executive Machines, Inc. d/b/a Jeam Imports' Motion for Summary Judgment (Doc. 48) and Plaintiffs Madalyn Thomas and Jason Thomas' Response in Opposition (Doc. 51).  Upon consideration of the parties' motions with briefs and exhibits, and for the reasons set forth below, Defendants' Motion will be granted in part and denied in part.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Madalyn Thomas, by and through her parent and natural guardian, Jason Thomas, and Jason Thomas, in his own right (hereinafter "Plaintiffs"), bring the instant personal injury action against Defendants Staples, Inc. and Executive Machines, Inc. d/b/a Jeam Imports

(collectively, "Defendants").  Plaintiffs allege that Plaintiff Madalyn Thomas ("Madalyn"), then

19 months old, while at her home, sustained personal injury on May 25, 2008 when her fingers

became entrapped in the opening of a MailMate Paper Shredder.  Plaintiff Jason Thomas

("Jason") is Madalyn's father.  Defendant Executive Machines d/b/a Jeam Imports manufactured,

assembled, and distributed the MailMate Paper Shredder in question.

Plaintiffs allege that the MailMate Paper Shredder was purchased online from

Staples.com on or about November 15, 2006 by Amy Thomas ("Amy"), Madalyn's mother,

while at her home in Dallas, Pennsylvania.  In choosing the paper shredder, Amy Thomas avers

that her main considerations were that the shredder be compact and easy to use.  The shredder

arrived shortly after the date of purchase and was placed on a countertop in the Thomas' kitchen,

where it remained until the date of the incident on May 25, 2008.  Jason and Amy Thomas

routinely used the shredder for the purpose of keeping their "junk mail" under control and

securing their personal information.  Either Jason or Amy would stand in front of the counter and

insert material into the machine to be shredded.

On the morning of May 25, 2008, Amy Thomas was in the process of shredding mail in

the MailMate Paper Shredder when Madalyn started crying and began to pull on Amy's leg.  At

this point, while the shredder was still operating, Amy picked up Madalyn and placed her on her

left hip.  Having made no attempt to unplug or turn off the shredder, Amy turned away from

Madalyn to get Madalyn some candy; as Amy turned back around to face Madalyn, she saw that

Madalyn's left hand had become stuck in the shredder.  Upon realizing that Madalyn's fingers

were stuck in the shredder, Amy unplugged the machine.  Amy does not recall whether there was

noise coming from the machine when Madalyn's fingers became stuck, whether Madalyn pulled

away from her in order to reach out to the machine, or whether any portion of the envelope she

had placed in the machine was still in the process of shredding.  Jason was able to extract Madalyn's hand from the shredder with the use of a crowbar.  Subsequently, Madalyn was transported to Wilkes-Barre Hospital for initial examination and then transported to Hershey Medical Center, where surgery was performed.  Madalyn's two partially-amputated fingers could not be reattached.

Subsequently, Plaintiffs commenced this action on August 18, 2009 with the filing of a Complaint against Staples, Inc.  On April 13, 2010, Plaintiff filed an Amended Complaint adding Executive Machines, Inc. d/b/a Jeam Imports as a second defendant.  Plaintiff's Amended Complaint includes claims for strict liability, negligence, breach of express warranty, breach of implied warranty, and compensatory and punitive damages.  Thereafter, on May 9, 2011, Defendants filed a Third-Party Complaint joining Jason and Amy Thomas as Third Party Defendants, averring that the incident described in the Plaintiff's Amended Complaint was due to the carelessness and negligence of the Third Party Defendants.  Defendants now move for summary judgment on all of Plaintiffs' claims.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed R. Civ P. 56(a); see also Levy v. Sterling Holding Co., LLC, 544 F.3d 493, 501 (3d Cir. 2008).  A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Dee v. Borough of Dunmore, 549 F.3d 225, 229 (3d Cir. 2008).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under

the substantive law, it would affect the outcome of the suit. See Anderson, 477 U.S. at 248;

Fakete v. Aetna, Inc., 308 F.3d 335, 337 (3d Cir. 2002).

The moving party must show that if the evidentiary material of record were reduced to

admissible evidence in court, it would be insufficient to permit the non-moving party to carry its

burden of proof. See Celotex v. Catrett, 477 U.S. 317, 327 (1986).  Once the moving party has

carried its burden under Rule 56, "its' opponent must do more than simply show that there is

some metaphysical doubt as to the material facts." Scott v. Harris, 550 U.S. 372, 380

(2007).  Under Fed. R. Civ. P. 56(e), the opposing party must set forth specific facts showing a

genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. See

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007).

At the summary judgment stage the court's function is not to weigh the evidence and

determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.

See Anderson, 477 U.S. at 249; Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 253 (3d

Cir. 2007).  In doing so, the court must construe the facts and inferences in the light most

favorable to the non-moving party. See Horsehead Indus., Inc. v. Paramount Communications,

Inc., 258 F.3d 132 (3d Cir. 2001).  The court must award summary judgment on all claims unless

the non-moving party shows through affidavits or admissible evidence that an issue of material

fact remains. See, e.g., Love v. Rancocas Hosp., 270 F.Supp.2d 576, 579 (D.N.J. 2003); Koch

Materials Co. v. Shore Slurry Seal, Inc., 205 F.Supp.2d 324, 330 (D.N.J. 2002).

4

# III.   DISCUSSION

## A.  Strict Liability (Count II)

### 1.   Applicable Law: The Restatement (Third) of Torts

As an initial matter, the Court must first address whether the Restatement (Second) or Restatement (Third) of Torts applies to Plaintiffs' strict liability claim in the matter *sub judice*.  It is undisputed that the substantive law of the Commonwealth of Pennsylvania supplies the rule of decision for the disposition of the Plaintiffs' strict products liability claims. 28 U.S.C. § 1652; see Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d Cir.2000) (citing Erie R.R. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). At the commencement of this lawsuit on August 18, 2009, Plaintiffs brought their strict liability claim pursuant to § 402A of the Restatement (Second) of Torts. (See Compl. ¶ 39.)  This may have been the appropriate law at that time.  In past products liability cases, the Pennsylvania Supreme Court has applied § 402A of the Restatement (Second) of Torts. See Webb v. Zern, 422 Pa. 424, 220 A.2d 853, 854 (1966) ("We hereby adopt the foregoing language [of § 402A] as the law of Pennsylvania.").  Section 402A provides:

> **§ 402A Special Liability of Seller of Product for Physical Harm to User or Consumer**
>
> (1) One who sells any product in a defective condition *unreasonably dangerous* to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> > (a) the seller is engaged in the business of selling such a product, and
> >
> > (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies although
>
> > (a) the seller has *exercised all possible care in the preparation and sale of his product*, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts § 402A (1965) (emphasis added).  Thus, § 402A makes sellers liable for harm caused to consumers by unreasonably dangerous products even if the seller exercised reasonable care.

Problematically, however, "Section 402A instructs courts to ignore evidence that the seller 'exercised all possible care in the preparation and sale of his product,' § 402A(2)(a), yet imposes liability only for products that are 'unreasonably dangerous,' § 402A(1)." Covell v. Bell Sports, Inc., 651 F.3d 357, 361 (3d Cir. 2011), cert. denied, 558 U.S. 1011, 132 S.Ct. 1541, 182 L.Ed.2d 162 (2012).  Negligence concepts are thus intrinsic to the language of § 402A, despite the provision's and the Pennsylvania Supreme Court's protestations to the contrary. See Phillips v. Cricket Lighters, 576 Pa. 644, 655-56, 841 A.2d 1000, 1006-07 (2003) (hereinafter "Phillips I") (conceding that even though the Pennsylvania Supreme Court had "remained steadfast in [its] proclamations that negligence concepts should not be imported into strict liability law, [the Court had] muddied the waters at times with the careless use of negligence terms in the strict liability arena."); see also id. at 1012 (Saylor, J., concurring) ("Central conceptions borrowed from negligence theory are embedded in strict products liability doctrine in Pennsylvania.")  The inherent contradiction apparent in the language of § 402A has resulted in products liability case law in Pennsylvania that is "almost unfathomable." Schmidt v. Boardman Co., 608 Pa. 327, 353, 11 A.3d 924, 940 (2011) (quoting James A. Henderson, Jr. & Aaron D. Twerski, Achieving Consensus on Defective Product Design, 83 Cornell L.Rev. 867, 897 (1998)); see also Phillips I, 841 A.2d at 1016 (Saylor, J., concurring) ("There are several ambiguities and inconsistencies in Pennsylvania's [products liability] procedure… which render our law idiosyncratic.") (internal citation omitted). Furthermore, it is also unclear under Pennsylvania case law whether a

bystander has the right to recover in a products liability action. Berrier v. Simplicity Mfg., Inc., 563 F.3d 38, 46-53 (3d Cir. 2009) (reviewing Pennsylvania appellate decisions regarding bystander liability).

Against this backdrop, the Third Circuit Court of Appeals in Berrier v. Simplicity Mfg., Inc. offered a prediction regarding the potential path of Pennsylvania products liability law. 563 F.3d at 40, cert. denied, 558 U.S. 1011, 130 S.Ct. 553, 175 L.Ed.2d 383 (2009). Specifically, Berrier Court was presented with the issue of whether, under Pennsylvania law, the Restatement (Second) or Restatement (Third) governed the potential imposition of strict liability on manufacturers for injuries sustained by bystanders harmed by their products. The Third Circuit predicted that "if the Pennsylvania Supreme Court were confronted with this issue, it would adopt the Restatement (Third) of Torts, §§ 1 and 2, and thereby afford bystanders a cause of action in strict liability…." Id. For its part, the Pennsylvania Supreme Court, despite several recent opportunities to do so, has yet to explicitly rule on whether the Restatement (Third) of Torts now provides the controlling analysis for products liability claims. See e.g., Schmidt v. Boardman Co., 608 Pa. 327, 11 A.3d 924, 940–41 (2011); Beard v. Johnson & Johnson, Inc., 615 Pa. 99, 41 A.3d 823 (2012); Lance v. Wyeth, 17 EAP 2011, 2014 WL 260309, at *14 n.23 (Pa. Jan. 21, 2014) ("[W]e have acknowledged difficulties with some of the concepts and conventions which have been employed to buttress the theoretical divide between strict products liability and negligence theory….While it is beyond the scope of this opinion to provide the needed reconciliation, clarification, or modification, we recently allowed appeal in Tincher v. Omega Flex, Inc., —— Pa. ——, 64 A.3d 626 (2013) (per curiam), with the hopes of doing so in such case.") The Third Circuit, however, has continued to reiterate its holding in Berrier that federal district courts sitting in diversity and applying Pennsylvania law to products liability cases

should look to sections 1 and 2 of the Restatement (Third) of Torts. <u>Covell</u>, 651 F.3d at 362 (3d Cir. 2011); <u>see also</u> <u>Sikkelee v. Precision Airmotive Corp.</u>, No. 12-8081, 2012 WL 5077571 (3d Cir. Oct. 17, 2012).

Thus, given that (1) the Pennsylvania Supreme Court has not expressly disavowed the Third Circuit's holdings in <u>Berrier</u>, <u>Covell</u>, and <u>Sikkelee</u>, and (2) the Third Circuit's prediction regarding Pennsylvania state law is binding on this Court absent a decision of the Pennsylvania Supreme Court to the contrary, this Court must and will apply sections 1 and 2 of the Restatement (Third) of Torts in the instant matter.  Section 1 of the Restatement (Third) provides: "One engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect." Restatement (Third) of Torts § 1 (1998).  The Restatement (Third) further provides:

**§ 2 Categories of Product Defect**

A product is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings. A product:

(a) contains a manufacturing defect when the product departs from its intended design even though *all possible care* was exercised in the preparation and marketing of the product;

(b) is defective in design when the *foreseeable* risks of harm posed by the product could have been reduced or avoided by the adoption of a *reasonable* alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not *reasonably* safe;

(c) is defective because of inadequate instructions or warnings when the *foreseeable* risks of harm posed by the product could have been reduced or avoided by the provision of *reasonable* instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the instructions or warnings renders the product not *reasonably* safe.

Id. at § 2 (emphasis added).  Accordingly, § 1 thus makes sellers or distributors liable for the sale of products that are "defective," while § 2 provides that a product is defective if it falls into one of three categories: it contains a manufacturing defect, it is defective in design, or it is defective because of inadequate instructions or warnings.  Further, § 2 clearly "incorporate[s] negligence concepts such as 'foreseeable risk' and 'care' directly into the definition of 'defective,'" and therefore expressly rejects the supposed "no negligence in products liability" regime that proved so problematic under § 402A.  Covell, 651 F.3d at 362 (quoting Azzarello v. Black Bros. Co., Inc., 480 Pa. 547, 556, 391 A.2d 1020, 1025 (1978)); see also Lynn ex rel. Lynn v. Yamaha Golf-Car Co., 894 F. Supp. 2d 606, 625 (W.D. Pa. 2012) ("The question of which Restatement governs is important because the Restatement (Third) differs notably from its predecessor by integrating certain negligence-based foreseeability concepts into its analysis. Restatement (Third) of Torts, Products Liability § 1 cmt. a. In contrast, Pennsylvania's products liability structure under the Restatement (Second) forbids a court to consider negligence principles.") (internal citations omitted).

In the present matter, Plaintiffs argue that the MailMate Paper Shredder was defective under of §§ 2(b) and 2(c).[1]  (See Am. Compl. ¶¶ 29-38.)  Before turning to the sufficiency of Plaintiffs' evidence under these sections, the Court will first address several miscellaneous arguments Defendants have asserted in support of their Motion for Summary Judgment. Defendants first argue that summary judgment is appropriate on Plaintiffs' strict liability claim because Madalyn was not the intended user of the paper shredder.  Defendants, citing Spowal v. ITW Food Equip. Grp. LLC, contend that "a manufacturer can be deemed liable only for harm

---

[1] Ostensibly, Plaintiffs also assert that the shredder contained a manufacturing defect under § 2(a). (See e.g., Am. Compl. ¶ 29(c), 29(f), 29(i).) However, neither Plaintiffs' Response in Opposition nor their expert report discusses any alleged manufacturing defects.  Both are limited to discussion of allegedly defective design and inadequate warnings and instructions.

that occurs in connection with a product's intended use by an intended user." 943 F. Supp. 2d 550, 562 (W.D. Pa. 2013); see also id. ("An unintended use, even if foreseeable, will not render a product defective.")  This Court, however, finds Spowal to be distinguishable from the instant matter.  Madalyn was not a "user" or the paper shredder, intended or otherwise.  That is to say, there is no record evidence that Madalyn was attempting to shred paper at the time of the incident.  Due of the confluence of Madalyn's youth and Amy Thomas' inattention, it is not known exactly how Madalyn's fingers became stuck in the paper shredder.  However, the circumstances would suggest that Madalyn's hand was somehow caught and/or pulled into the machine while her mother was using the shredder.  The Court therefore agrees with Plaintiffs that Madalyn should properly be considered a bystander and not a user of the allegedly defective shredder.  As has been discussed, the Restatement (Third) permits bystanders to bring strict liability claims against sellers and distributors of allegedly defective products. See Berrier, 563 F.3d at 54 ("As is readily apparent from this text, the Third Restatement does not limit a strict liability cause of action to the 'user or consumer,' and broadly permits any person harmed by a defective product to recover in strict liability."); see also Lynn, 894 F. Supp. 2d at 633 ("[This] Court would note that…given the evolution of the precedent of our Court of Appeals, the district courts within the circuit, and the Supreme Court of Pennsylvania, the legal principles of 'intended use' and 'intended user' have little bearing on the current state of products liability law in Pennsylvania as this Court is required to apply it.  They are issues endemic to a Restatement (Second) analysis.").  Defendants' unintended user analysis is therefore incorrect.

Defendants have also argued the MailMate Paper Shredder was not defective because it received a "UL certificate."[2]  Plaintiffs dispute that the paper shredder complied with UL

---

[2] Underwriters Laboratories ("UL"), which issues "UL certificates," is a nonprofit testing laboratory which evaluates

requirements.  However, even if the paper shredder was UL certified, this standing alone would

not be a proper basis for granting summary judgment.  Evidence of compliance with industry

standards goes only to the reasonableness of the Defendants' design choices.  Evidence of

compliance is not, therefore, dispositive of whether or not a product is defective.  A reasonable

jury could still find Defendants strictly liable even if they complied with UL requirements or

other industry-wide practices.  See Brodsky v. Mile High Equip. Co., No. 99-3464, 2002 WL

32364546, at *1 (E.D. Pa. Mar. 25, 2002) aff'd sub nom. Brodsky ex rel. Brodsky v. Mile High

Equip. Co., 69 F. App'x 53 (3d Cir. 2003); see also Covell, 651 F.3d at 366 (holding that under §

2 of the Restatement (Third) evidence of compliance with industry standards and government

regulations are admissible at trial).

 Likewise, Defendants' assertion that they complied with the recommendations of the

Consumer Product Safety Commission ("CPSC") is also unavailing.  The fact that the CPSC

apparently did not require corrective action from Staples after Staples reported an unspecified

incident or incidents[3] to it is no basis for granting summary judgment.  Further, as Plaintiffs

argue, the letter Staples received from the CPSC contains numerous deficiencies which

undermine its persuasive value.[4]

---

and certifies that a given product has met certain usage, performance, and safety requirements.  Manufacturers
submit products to UL for testing and safety certification on a voluntary basis.  UL is one of several companies
authorized by the Occupational Safety and Health Administration ("OSHA") to perform safety testing in the United
States.  See generally UL Home Page, http://www.ul.com/global/eng/pages/ (lasted visited Feb. 25, 2014).

[3] The letter vaguely states that Staples "reported" to the CPSC "due to…potential laceration and amputation hazards"
in an unspecified MailMate Paper Shredder. (Defs.' Ex. G at 1.)  The letter does not specify whether it concerns the
particular model MailMate Paper Shredder that is the subject of this litigation.  The letter also does not specify what,
exactly, Staples reported to CPSC.  Staples also did not submit whatever correspondence it sent to the CPSC which
precipitated it receiving this letter.  As such, the Court has no way of evaluating what the CPSC was responding to.

[4] For instance, as discussed in footnote 3, supra, it is not clear that the letter specifically concerns the Madalyn
Thomas incident.  The letter is dated November 30, 2011.  According to the letter, Staples did not report the
unspecified incident or incidents until June 9, 2011.  If the letter does refer to the Madalyn Thomas incident, then
there is an obvious question as to why Staples waited more than three years to report the incident to the CPSC.
Additionally, the letter is clear that the CPSC's conclusion that no corrective action is necessary was "based upon

### 2. Design Defect

To establish a prima facie case of design defect under the Restatement (Third) of Torts, a plaintiff "must prove the availability of a technologically feasible and practical alternative design that would have reduced or prevented the plaintiff's harm." Restatement (Third) of Torts § 2, cmt. f.  "More specifically, the test is whether a reasonable alternative design would, at reasonable cost, have reduced the foreseeable risks of harm posed by the product and, if so, whether the omission of the alternative design by the seller…rendered the product not reasonably safe." Id. at cmt. d.  Finally, the plaintiff must be able to prove that the design defect of the product caused the plaintiff's harm. Id. at § 1.

The Court concludes that Plaintiffs have produced sufficient evidence such that a reasonable jury could conclude that the MailMate Paper Shredder at issue contains certain design defects which render it unreasonably dangerous.  In his expert report, Plaintiffs' expert, Dr. Steven Tipton, concludes that the MailMate Paper Shredder is "defective and unreasonably dangerous," especially for small children. (Pls.' Ex. B at 15) (hereinafter "Tipton Report I").  Dr. Tipton's conclusion is based on a number of factors.  First, Dr. Tipton notes that Staples markets the MailMate Paper Shredder for "Home Office/Small Business" use.  Accordingly, he argues, "the presence of children" around the MailMate Paper Shredder is "eminently foreseeable." (Id. at 3.)  Nevertheless, according to Dr. Tipton the MailMate contains no safety features that would protect curious children. (Id. at 4, 14.)  In addition, Dr. Tipton avers that the small size of the shredder (11 inches) makes it easily accessible to small children; Dr. Tipton further notes that the average toddler of Madalyn's age at the time is 30 to 36 inches. (Id.  at 5.)  Further, Dr. Tipton claims that the MailMate has a pull force nearly twice as strong as other home paper shredders.

the information that [Staples] provided." (Defs.' Ex. G at 2.)  Again, without knowing what information Staples provided to the CPSC, the Court is unable to evaluate the letter's persuasive value.

(Id. at 5.)  This feature, coupled with the fact that shredder's blades are only 1.25 inches below

the inlet slot, alleging makes it easy for fingers (especially those of a small child) to become

trapped in the slot opening. (Id. at 9-11.)  Dr. Tipton terms this the MailMate's "trap and pull"

mechanism.  Dr. Tipton also generally notes that, as early as December 2004, the CPSC issued

publication number CPSC-ES-0501, entitled "An Evaluation of Finger Injuries Associated with

Home Document (Paper) Shredder Machine." (Id. 1; see also Pls.' Ex.G.)  According to Dr.

Tipton, this publication "documented the hazard posed by paper shredders and recommended

voluntary standards using small accessibility probes" that would presumably act as more

accurate approximations of a children's fingers. (Id.)  Based on this publication, Dr. Tipton

argues that Staples had reason to know of the dangers posed by home paper shredders like the

MailMate.

Dr. Tipton then goes on to opine on several "inexpensive" design changes that, in his

opinion, would have made the MailMate safer. (Id. at 12-14.)  The first design change Dr. Tipton

recommends is narrowing the slot opening at the top of the shredder, which would "eliminate the

trap and pull funnel" and "double the distance from the opening to the blades." (Id. at 12.)  In

addition to narrowing the slot opening, Dr. Tipton further recommends adding "stiffening ribs"

to the opening "that could be molded into the top to increase the compliance of the opening if a

finger happened to get pinched and pulled into the narrow slot." (Id.) Alternatively, Dr. Tipton

avers that another inexpensive modification would adding a snap-on cover.  This cover would be

"placed [over] the opening with a slot either directly above the existing slot…or off to the side."

(Id. at 13.)  Either type of cover would "narrow the opening at the point of insertion and

effectively put the fingers further from the cutting blades." (Id.) Dr. Tipton further notes that one

of these protective covers could have been provided to purchasers of the 2006 MailMate after the fact. (Id.)

In sum, it is Plaintiffs' position that the MailMate Paper Shredder was defective because, *inter alia*, the shredder opening and blades were accessible to small children. It is further Plaintiffs' position that this danger could have been easily corrected with minimal design changes and without affecting the shredder's functionality. Plaintiffs also contend that there are already devices on the market which contain the safety features recommended here by Dr. Tipton. Plaintiffs' position, as supported by Dr. Tipton, speaks to the issues of foreseeability of harm and "reasonable alternatives" with which § 2 of the Restatement (Third) is concerned. Thus, the Court finds Plaintiffs have adduced sufficient evidence to make out a prima facie case of design defect under the Restatement (Third) of Torts.

Defendants, however, argue that Plaintiffs are unable to demonstrate that any alleged defect in the shredder was the proximate cause of Madalyn's injury. Defendants' further assert that "there is no expert report on this issue and any such potential report would be based on conjecture as no one witnessed how Madalyn got her fingers into the shredder." (Defs.' Mot. Summ. J. 13.)

The Court disagrees. It is true that Amy Thomas testified that, because her head was turned away from Madalyn at the time of the incident, she does not know whether the shredder was still shredding at the time of the incident or whether Madalyn pulled away from her in order to reach out to the machine. Nonetheless, the Court finds that genuine issues of material fact remain as to whether Plaintiffs can establish the causation element. Defendants' expert, CED Technologies, Inc., concluded in their expert report that "user misuse was a cause and/or contributing factor to the incident." (Pls.' Ex. I) (hereinafter "CED Report"). Specifically, the

14

"misuse" to which the CED Report refers is Amy Thomas "leaving Madalyn within arm's reach of the operating shredder," despite the fact that Amy, as she acknowledged at her deposition, had (1) read the shredder's instruction manual prior to the 2008 incident, which contained warnings regarding keeping children away and not inserting fingers into the shredder opening, and (2) a warning icon on the shredder further advises users to not place fingers into the shredder opening. Id. at 14-15 (citing Amy Thomas Dep. 26:2-27:9; 32:15-36:5.)  Conversely, Dr. Tipton opined in his supplemental report that it was "highly unlikely" that Madalyn would have been able to "push her fingers into the slot of the Mail[M]ate all the way to the blades." (Pls.' Ex. C at 1) (hereinafter "Tipton Report II").  Dr. Tipton thus reiterates his position that Madalyn's fingers were "pinched and pulled" into the opening of the shredder." Id.

Based on the foregoing analysis, the Court finds that fact issues preclude summary judgment on Plaintiffs' design defect claim.

### 3.  Instructions or Warnings

"Commercial product sellers must provide reasonable instructions and warnings about risks of injury posed by products." Restatement (Third) of Torts § 2 cmt. i.  "Under a failure-to-warn theory of strict liability, a plaintiff must prove that adequate instructions or warnings were not provided and the omission of such warnings, which could have reduced or avoided the foreseeable risks of harm posed by the product, not only renders the product not reasonably safe but caused the plaintiff's harm." Lynn, 894 F. Supp. 2d at 639 (citing Restatement (Third) of Torts §§ 1–2; § 2, cmt. i).  Thus § 2(c), similar to § 2(b), adopts a reasonableness test for judging the adequacy of product instructions and warnings. Restatement (Third) of Torts § 2, cmt. i.  In making this assessment, "courts must focus on various factors, such as content and comprehensibility, intensity of expression, and the characteristics of expected user groups." Id.

Importantly, however, commercial product sellers are usually "not liable for failing to warn or instruct about obvious risks generally known by foreseeable users." Id. at cmt. j. "When a risk is obvious or generally known, the prospective addressee of a warning will or should already know of its existence." Id. The rationale for this is twofold. First, warnings of an obvious or generally known risk do not provide an effective additional measure of safety. Id. Moreover, warnings of an obvious or generally known risk could be ignored by consumers, and thereby diminish the import of non-obvious, not-generally-known risks. Id. Thus, the concern is that "requiring warnings of obvious or generally known risks could reduce the efficacy of warnings generally." Id. When reasonable minds can differ as to whether the risk was obvious or generally known, the issue is to be decided by the trier of fact. Id.

Here, Plaintiffs' argue that the warnings on the MailMate Paper Shredder were insufficient. Plaintiffs aver that a lay person would not appreciate the pulling force of the MailMate, or how easily the shredder could pull a child's finger into the machine. According to Plaintiffs, the blades of the MailMate represent a "latent danger" because the blades are not visible and therefore it is not obvious that a child's fingers could reach all the way to the blades. Conversely, Defendants argue that it is a matter of general knowledge to any parent with a young child that the child must be watched at all times while in the vicinity of a paper shredder. Further, Defendants contend that the owner's manual for the MailMate Paper Shredder specifically states to "Keep children and pets away from the shredder **AT ALL TIMES**," as well as to "**NEVER** insert hand or fingers into the feed opening." (Defs.' Ex. E) (emphasis in original).[5] Defendants further note that Amy Thomas acknowledged during her deposition that

---

[5] Defendants' are incorrect that the 2006 model of the MailMate Paper Shredder that is the subject of this case contained "iconic warnings" relating to the specific danger the shredder posed to children. While the 2006 MailMate did contain certain iconic warnings, none of them specifically related to children. As stated by Dr. Tipton, an iconic warning which communicates "Keep Children Away" was not added until the 2007 model of the MailMate.

she received the owner's manual, and read these specific warnings. (Amy Thomas Dep. 26:2-27:9.) Additionally, Amy testified that she recognized the purpose of the machine and that it could injure hands if they were inserted into the shredder.  Specifically, Amy Thomas stated that the reason not to put hands near the shredder blades is "because you will get hurt…it's a machine that's designed to shred paper." (Id. at 33:18-23.)  Amy further acknowledged that there were picture warnings visible on the shredder that demonstrated not to place hands, hair, or ties near the shredder and that the shredder was strong enough to shred CDs, credit cards, and paper clips. (Id. at 32:15-36:5.)  Jason Thomas had the same understanding of what the picture warnings meant. (Jason Thomas 14:2-15:23.)

The Court finds that no reasonable jury could conclude, based on the record evidence presented, that the MailMate Paper Shredder was defective because of inadequate instructions or warnings.  The Court first notes that Plaintiffs' arguments are relevant to the sufficiency of the MailMate's design, not to the adequacy of its warnings.  But while (as discussed above) the MailMate may have been defective because of its design, the Court does not find it was defective as result of a failure to warn.  The danger posed by a paper shredder is obvious to adults.  The shredder in question was housed on a kitchen countertop, well-above the normal reach of Madalyn.  (Jason Thomas Dep. 16:15-21.)  The only reason Madalyn was able to access the shredder is because she was on her mother's hip at the time of the incident.  Amy Thomas, by her own admission, recognized the danger that a shredder presents to young children.  She had read the owner's manual, and she understood the meanings of all the picture warnings on the shredder itself.  These admissions, coupled with the aforementioned warnings, negate Plaintiffs' failure to warn claim.  There is nothing which suggests that any member of the Thomas family

---

(See Tipton Report I at 2 & 4) (comparing photographs of the remnants of the Thomas' 2006 MailMate and photographs of an exemplar 2007 MailMate).

would have altered his or her behavior if additional or different warnings were in place at the time of the incident.  Simply put, given the obviousness of this risk, the adults' knowledge of the dangers that a shredder presents to young children, and the warnings discussed, there is not sufficient evidence to establish with some reasonable likelihood that any additional warnings would have prevented Madalyn's injury.

Defendants' Motion for Summary Judgment is therefore granted with respect to Plaintiffs' strict liability claim for failure to warn.

## B.  Negligence (Count I)

Under Pennsylvania law, a plaintiff's negligence claim must demonstrate each of the following factors: (1) a duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct; (2) a failure to conform to the standard required; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting to the interests of another. Morena v. S. Hills Health Sys., 501 Pa. 634, 642 n. 5, 462 A.2d 680 (1983).  In the present case, Defendants contend that Plaintiffs cannot establish the duty and causation elements of a negligence claim.[6]  The Court disagrees on both accounts.

### 1.  Duty of Care

The Court first notes that Defendants' claim that it owed no duty to Madalyn is premised on their assertion that Madalyn was not the intended user of the MailMate Paper Shredder.  For the reasons previously discussed in section III.A.1, *supra*, Defendants' intended user analysis is inapplicable here.

Whether a defendant owes a duty of care to a plaintiff is a question of law in Pennsylvania. Kleinknecht v. Gettysburg College, 989 F.2d 1360, 1366 (3d Cir.1993).  The duty

---

[6] Because Defendants only argue that Plaintiffs cannot establish the duty and causation elements, the Court will also limit its discussion to these two elements.

of care inquiry is a policy decision which requires the trial court to apply the "Althaus test," which requires consideration of: "(1) the relationship between the parties; (2) the social utility of the [defendant's] conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the [defendant]; and (5) the overall public interest in the proposed solution." Althaus v. Cohen, 562 Pa. 547, 756 A.2d 1166, 1169 (2000). "No one of these five factors is dispositive. Rather, a duty will be found to exist where the balance of these factors weighs in favor of placing such a burden on a defendant." Phillips I, 841 A.2d at 1008-09. Because Defendants applied the incorrect analysis, their briefs do not discuss which of the Althaus factors, if any, weigh in favor of finding that they owed no duty to Madalyn. Meanwhile, Plaintiffs' analysis of the Althaus factors is cursory at best, and appears to discuss only the third, fourth, and fifth factors. (See Pls.' Resp. Opp'n Mot. Summ. J. 17-18.) Nonetheless, the Court is mindful that at the summary judgment stage the trial court must view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Horsehead Indus., 258 F.3d at 132.

As to the first factor, a relationship clearly exists between Amy Thomas, the purchaser of the MailMate, and the Defendants. A relationship also exists between Jason Thomas, a user/consumer of the MailMate, and the Defendants. However, the Court finds that it is uncertain what relationship exists between Madalyn and the Defendants. See Phillips I, 841 A.2d at 1009 (finding "there was clearly a relationship" between the plaintiff mother/purchaser and the defendant butane lighter manufacturers, but that the relationship between the plaintiff children who died in a fire and the defendant lighter manufacturers was "less certain."); Berrier, 563 F.3d at 62 (citing Phillips I and finding an "uncertain" relationship existed between the minor child

who suffered injuries after her grandfather drove a riding lawnmower in reverse over her leg and the defendant lawnmower manufacturer).  As such, the Court finds that this factor weighs against the existence of an underlying duty to Madalyn. See Phillips, 841 A.2d at 1009; Berrier, 563 F.3d at 62.

Next, the Court must examine the social utility of the Defendants' conduct— *i.e.*, the production of paper shredders without the child safety features proposed by Dr. Tipton (a narrower opening, "stiffening ribs," and a cover).  A home paper shredder has obvious social utility in that it can be used to shred personal documents and keep personal information secure. Indeed, Jason and Amy Thomas testified that they purchased the MailMate for this very reason. It is not clear, however, what benefits are derived from a paper shredder that lacks these child safety features.  Defendants have presented no evidence that the utility of the MailMate is increased or improved when child safety features are lacking.  Conversely, it is readily apparent that a device which would prevent small children, who lack the discretion and caution of the average adult, from sticking their fingers into shredder openings would have great utility in our society.  This is especially true given the risk of injuries, including finger amputations like Madalyn's, which was documented by the CPSC as early as December 2004. (Pls.' Ex. G.)  Thus, after viewing the evidence in the light most favorable to the Plaintiffs, the Court finds that the second factor weighs in favor of finding that Defendants owed a duty to the Plaintiffs.

The third factor of the duty inquiry balances social utility of a design against the extent and foreseeability of the harm that would result in its absence.  Defendants have put forth no arguments or evidence in favor of the MailMate Paper Shredder's 2006 design.[7]  As such, the

---

[7] Defendants' expert, CED Technologies, Inc., offered two opinions its expert report: (1) "that the subject shredder met Underwriter Laboratory['s]…design criteria that applied at the time of its manufacture," and (2) "user misuse was a cause and/or contributing factor to the incident." (Pls.' Ex. I at 14.)  Thus, although CED Technologies stated that it had reviewed Dr. Tipton's expert report, (see id. at 3), CED Technologies' own report offers no response or

Court is not in a position to evaluate the social utility of the MailMate Paper Shredder as it was designed in 2006. Plaintiffs, however, have adduced evidence that a few simple design changes could have greatly reduced the risk to children associated with the 2006 MailMate. (See Tipton Report I at 12-14.) Moreover, Plaintiffs have adduced evidence that the design recommendations made by Dr. Tipton are in line with the recommendations made by the CPSC in its 2004 "Evaluation of Finger Injuries Associated with Home Document (Paper) Shredder Machine." (Pls.' Ex. G.) Furthermore, the CPSC publication also contains the results of an investigation the CPSC conducted into reported injuries sustained by children due to home paper shredders. Based on this report, and the fact that the MailMate Paper Shredder is specifically marketed by Staples for home use, Plaintiffs contend that it was reasonably foreseeable that a child like Madalyn could be injured by the subject paper shredder. Taking the evidence in the light most favorable to the Plaintiffs, the Court finds that Plaintiffs' evidence establishes that the risk imposed by the lack of child safety features is a serious one, and that the harm flowing from this risk was foreseeable by the Defendants. Thus, the third prong of the Althaus test also weighs in favor of finding a duty exists.

The fourth factor requires the court to consider the consequences of imposing a duty on the Defendants. Dr. Tipton's report avers that his proposed design changes are "simple" and "inexpensive." (See Tipton Report I at 12-14.) Dr. Tipton's report does not provide an estimate as to how much these design changes would cost. Generally speaking, however, the Court agrees that Dr. Tipton's proposed design changes appear relatively modest. Nothing about Dr. Tipton's proposed changes suggest that a complete and costly overhaul of the MailMate's design

---

counterarguments to Dr. Tipton's conclusions.

is necessary.[8]  Given the apparent modesty of an alternative design, the Court will also weigh this factor in favor of finding a duty.

Finally, the Court considers the public interest in imposing a duty on paper shredder manufacturers to produce paper shredders with child safety features.  The Court has little difficulty in concluding there is a strong public interest in avoiding serious and potentially permanent injuries to young children as a result of their unknowingly getting their fingers caught in paper shredders.  Accordingly, this factor weighs in favor of finding a duty.

In sum, viewing the evidence in the light most favorable to the non-moving party, the Court believes that four out of five of the Althaus factors weigh in favor of finding that the Defendants owed Plaintiffs a duty to include some form of child safety features to the MailMate Paper Shredder.

### 2.  Causation

Defendants' assertion that Plaintiffs cannot establish the causation element of their negligence claim can be quickly disposed of.  In this regard, Defendants again argue that Plaintiffs cannot establish causation because no one knows exactly how Madalyn's fingers became stuck in the paper shredder.  For the reasons previously discussed with respect to Plaintiffs' strict liability design defect claim in section III.A.2, *supra*, the Court disagrees.  It cannot be said, as a matter of law, that there was no causation.

For the foregoing reasons, the Court concludes that Plaintiffs have introduced evidence such that there was a jury question as to whether Defendants were negligent in designing the MailMate Paper Shredder.  Summary Judgment is therefore denied on Plaintiffs' negligence claim.

---

[8] Again, Defendants' expert report offers no response to Dr. Tipton's assertion that his proposed design changes are both "simple" and "inexpensive." (See footnote 7, *supra*.)

**C. Breach of Express Warranty (Count III) and Breach of Implied Warranty (Count IV)**

Plaintiffs' Amended Complaint next alleges claims for breach of express warranty and breach of implied warranty. With respect to their breach of express warranty claim, Plaintiffs' claim they "relied upon the skill and judgment of [D]efendants and upon [D]efendants' express warranty that the MailMate Paper Shredder was safe." (Am. Compl. ¶ 43.) Plaintiffs aver that "[a]s a result of the defects in material and workmanship, [D]efendants breached their express warranty that the MailMate Paper Shredder was in a marketable condition, *safe for use by ultimate users and in particular the plaintiff*."[9] (Id. at 44) (emphasis added). With respect to the breach of implied warranty claim, Plaintiffs contend

> Defendants impliedly warranted that the MailMate Paper Shredder when used was fit for the purpose for which it was designed, that it was [a] safe and suitable product *to be used by children*, that the product was equipped with safety features that would protect the users, and that said product was fit and suitable for that purpose. In reliance upon [D]efendants' skill and judgment and the implied warranties of fitness for that purpose, the plaintiff used and operated the MailMate Paper Shredder.

(Id. at 47.)

Defendants have moved for summary judgment on both of Plaintiffs' warranty claims. In their Response in Opposition, Plaintiffs set forth no arguments in support of their breach of warranty claims. The Court therefore considers these claims to have been abandoned by Plaintiffs. Further, the Court agrees with Defendants that there is no evidence which supports either of Plaintiffs' breach of warranty claims. As Plaintiffs have acknowledged, Madalyn was not a "user" of the paper shredder. (See Pls.' Resp. Opp'n Mot. Summ. J. 1) ("…Madalyn was a bystander and not the user at the time of the subject incident.") Plaintiffs point to no express or implied affirmations by Defendants that the MailMate Paper Shredder was safe for bystanders,

---

[9] The singular "plaintiff" referred to this count is Madalyn Thomas.

23

especially not when the bystander in question is a young child.

Accordingly, the Court grants summary judgment on Plaintiffs' breach of express and implied warranty claims.

### D. Punitive Damages (Counts I-V)

Finally, Defendants seek summary judgment on Plaintiffs' claim for punitive damages. Pennsylvania has adopted the Restatement (Second) of Torts as the standard for punitive damages.  See e.g., Chambers v. Montgomery, 411 Pa. 339, 344, 192 A.2d 355, 358 (1963).  The Restatement (Second) provides: "Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." Restatement (Second) of Torts § 908(2) (1979).  As the name suggests, punitive damages are penal in nature and are only proper when a defendant's actions are so outrageous as to demonstrate willful, wanton, or reckless conduct. Restatement (Second) of Torts § 908 cmt. b ("The conduct must be outrageous, either because the defendant's acts are done with an evil motive or because they are done with reckless indifference to the rights of others.")

The Pennsylvania Supreme Court has stressed that in a punitive damages inquiry, "state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious." Feld v. Merriam, 506 Pa. 383, 396, 485 A.2d 742, 748 (1984).  In Martin v. Johns-Manville Corp., the Pennsylvania Supreme Court first noted that Comment b of § 908 refers to Restatement (Second) § 500 as defining the requisite state of mind for punitive damages based on reckless indifference. 508 Pa. 154, 170, 494 A.2d 1088, 1097 (1985) (plurality opinion).[10] Section 500 states:

---

[10] Although Martin was a plurality decision, it's analysis of punitive damages claims was approvingly cited in SHV Coal, Inc. v. Cont'l Grain Co., 526 Pa. 489, 493, 587 A.2d 702, 704-05 (1991) and Hutchison ex rel. Hutchison v. Luddy, 582 Pa. 114, 123, 870 A.2d 766, 771-72 (2005).

> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

Restatement (Second) of Torts § 500 (1965).  The <u>Martin</u> Court then noted that §500 describes two different types of reckless conduct: (1) where the "actor knows, or has reason to know, ... of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk," and (2) where the "actor has such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so." <u>Martin</u>, 494 A.2d at 1097 (quoting Restatement (Second) § 500 cmt. a).  The <u>Martin</u> Court then concluded that, in Pennsylvania, "only the first type of reckless conduct described in comment a to Section 500, is sufficient to create a jury question on the issue of punitive damages." <u>Id.</u>  In reaching this conclusion, the <u>Martin</u> Court reasoned that the first type of reckless conduct "demonstrates a higher degree of culpability than the second on the continuum of mental states which range from specific intent to ordinary negligence." <u>Id.</u>  This higher degree of culpability is necessary for the imposition of punitive damages because "[i]t is impossible to deter a person from taking risky action if he is not conscious of the risk." <u>Id.</u> at 1097 n. 12.  Accordingly, "an appreciation of the risk [of harm] is a necessary element of the mental state required for the imposition of [punitive] damages." <u>Id.</u>  In Pennsylvania, therefore, a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed, and (2) the defendant acted, or failed to act, in conscious disregard of that risk. <u>Id.</u> at 1097-98; <u>see also</u> <u>Hutchison ex rel. Hutchison v. Luddy</u>, 582 Pa. 114, 124, 870 A.2d 766, 772 (2005).

25

Here, Defendants contend there is no evidence they engaged in any conduct that can be deemed outrageous because of the Defendant's evil motive or reckless indifference to the rights of others.  In making this argument, Defendants rely on the Pennsylvania Supreme Court's decision in Phillips v. Cricket Lighters, 584 Pa. 179, 883 A.2d 439 (2005) (hereinafter "Phillips II").  In Phillips II, three people (including two children) died in a house fire as a result of a two year-old playing with a cigarette lighter he found in his mother's purse.  The lighter did not have child-resistant features, and the administratrix of the estates of the decedents brought a products liability action against the manufacturers and distributors of the lighters.  Defendants argue that the instant case, like Phillips II, involves a minor's "unintended use" of a product. Defendants maintain that Plaintiffs have not adduced any evidence to establish that they had an evil motive and/or acted with reckless indifference to the rights of others.

In response, Plaintiffs contend that Pennsylvania courts have permitted punitive damages where a defendant has recklessly or intentionally allowed a defective product to remain on the market.  In making this argument, Plaintiffs rely on the Superior Court of Pennsylvania's decision in Daniel v. Wyeth Pharm., Inc., 2011 PA Super 23, 15 A.3d 909 (Pa. Super. Ct. 2011), appeal dismissed as improvidently granted, Daniel v. Wyeth Pharm., Inc., 82 A.3d 942 (Pa. 2013).  In Daniel, a patient-plaintiff brought action against a hormone therapy drug manufacturer, alleging that her use of the drug Prempro caused her to be diagnosed with breast cancer.  A jury awarded the plaintiff punitive damages.  However, the trial court judge granted the defendant-manufacturer's motion for judgment notwithstanding the verdict ("JNOV") as to the punitive damages claim.  See Daniel v. Wyeth Pharm., Inc., 2008 WL 4386013 (2008).  The Superior Court reversed the trial court's grant of JNOV, holding that "[c]ontrary to the trial court's findings, a jury could reasonably find that [the defendant] knew that additional studies

were required to understand the possible association between its products and breast cancer in menopausal women." Daniel, 15 A.3d at 932.  The Superior Court further noted that the trial court's reliance on the defendant's compliance with the Food and Drug Administration's ("FDA") testing and labeling requirements as a basis for granting JNOV was "misplaced."  Id. The Superior Court observed that "our Supreme Court ruled that compliance with industry and governmental safety standards 'does not, standing alone, automatically insulate a defendant from punitive damages.'"  Id. (quoting Phillips II, 883 A.2d at 447).

Here, Plaintiffs claim that, as in Daniel, Defendants knew of the risk of children being exposed to the paper shredder, but failed to design a produce to guard against this danger. Thus, Plaintiff's argue, even if Defendants complied with the UL requirements, they can still be liable for punitive damages.  According to Plaintiffs, Defendants' knowledge of the risk to children came from several sources.  Plaintiffs first argue that Defendants had reason to know of the risk due to CPSC's publication of the aforementioned December 2004 report on hand injuries caused by paper shredders. (Pls.' Ex. G.)  Plaintiffs further contend that Staples had actual knowledge of the risk because it was involved in prior litigation involving a child injured by a MailMate Paper Shredder. (Pls.' Ex. H.)  Finally, Plaintiffs argue that Defendants failed to timely report injuries caused by the MailMate Paper Shredder to the CPSC, as evidenced by the November 28, 2011 letter Staples received from the CPSC. (Defs.' Ex. G.)  According to Plaintiffs, Defendants' failure to timely report violates federal reporting requirements.

The Court finds that Plaintiffs' arguments miss the mark.  Unlike the defendant in Daniel, the Defendants here are not arguing that summary judgment should be granted on Plaintiffs' punitive damages claim based on the fact they complied with the UL requirements.  Rather, Defendants argue that their alleged conduct in this case was not so outrageous as to warrant

punitive damages.  The Court agrees.  Both factually and substantively, this case is more akin to Phillips II than to Daniel.  In support of her punitive damages, the plaintiff in Phillips II had presented evidence that fires caused by children playing with butane lighters resulted in the deaths of 120 people per year, and an additional 750 people were injured in these fires. Phillips II, 883 A.2d at 446. The plaintiff had also introduced evidence which established that the estimated annual cost of child-play butane lighter fires to be between $300–375 million. Id. Further, the plaintiff in Phillips II had presented deposition testimony from an employee of the defendant-manufacturer, who testified that (1) the defendant knew of the dangers posed by young children playing with butane lighters; (2) the defendant could easily have placed child resistant features of their butane lighters; and (3) the defendant opted not to place such features on their lighters because market testing showed that customers were opt not to buy such a product.  Id. With respect to this last admission by the defendant's employee, the plaintiff argued that the defendant's "weighing of financial factors [was] a resounding indictment" of the defendant, which "assuredly show[ed]" that their conduct was outrageous. Id.  But even in the face of this evidence the Pennsylvania Supreme Court concluded, as a matter of law, that the defendant's conduct was *not* sufficiently outrageous to warrant punitive damages. Id. At 446-47. Accordingly, the Supreme Court reversed the Superior Court's finding that the plaintiff had adduced enough evidence regarding her punitive damages such that a jury issue was created. Id. at 447.  Here, the Plaintiffs' evidence in support of punitive damages — the CPSC publication warning of possible finger injuries; Staples' knowledge of the risk of finger injuries from prior litigation; the relative simplicity and inexpense of adding child safety features to the paper shredder — is no different from the evidence the Pennsylvania Supreme Court considered and rejected in Phillips II.  There is no reason this Court should reach a different result.

The Phillips II Court considered several factors in reaching its conclusion.  First, the Phillips II Court noted that there is a significant distinction between negligence cases and cases where punitive damages are warranted.  Cautioning that punitive damages are an "extreme remedy available in only the most exceptional matters," the Phillips II Court opined that "a showing of mere negligence, or even gross negligence, will not suffice to establish that punitive damages should be imposed." Id. at 445 (internal quotation omitted).  Phillips II further explained,

> What is clear from [our] cases is that there is a distinction between negligence and punitive damages claims, with a plaintiff being required to meet a far lesser burden to establish a negligence claim than that which is imposed in connection with a punitive damages claim. This distinction is an important one. Damages awarded in a negligence action compensate a plaintiff for his or her losses. Punitive damages, in contrast, are not awarded to compensate the plaintiff for her damages but rather to heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious…. *Such a punishment should not be meted out to every defendant who is found to have acted negligently*; rather, it should be reserved for those cases in which the defendant has acted in a particularly outrageous fashion.

Id. at 446 (internal citation omitted) (emphasis added).  This Court finds that nothing in the evidence suggests that Defendants' alleged conduct was "particularly egregious" enough to warrant the "extreme remedy" of punitive damages.  As in Phillips II, nothing in the record suggests that Defendants had an "evil motive" of intentionally manufacturing a product without specific child safety features. Id. at 447.  Likewise, nothing in the evidence suggests that Defendants acted with a reckless indifference of a risk of harm which was "substantially greater than that which is necessary to make their conduct negligent." Id.

Secondly, the Phillips II Court considered relevant the fact that the allegedly dangerous aspect of the butane lighter did not arise of an intended use of the lighter; rather, the lighter was only dangerous when "improperly utilized" by a young child.  Id.; see also id. ("While failure to mitigate and prevent a danger posed by misuses can give rise to liability in negligence, such a

failure looks far less wanton than if the alleged danger arose in connection with the normal use

of the product.")   Similarly, the paper shredder here only became dangerous after Madalyn's

hand was put within reach of the shredder by her mother.  It also remains unclear whether

Madalyn reached toward the machine or whether her fingers were somehow caught and pulled

into the machine.

Third, Phillips II noted that the parties agreed that at the time the butane light was sold it

complied with relevant industry safety standard. Id. Here, although there is some dispute as

whether Defendants complied with the UL requirements, [11] it is apparent that Defendants were

operating under the presumption that they had complied with the correct UL requirements.

Defendants' belief that they were in compliance with the UL requirements cuts against any

suggestion that they were reckless with regard to the safety of their product.  See id. ("Of course,

compliance with safety standards does not, standing alone, automatically insulate a defendant

from punitive damages; [however,] it is a factor to be considered in determining whether

punitive damages may be recovered.")

Finally, the Phillips II Court "flatly reject[ed]" any suggestion that the defendant's

"weighing of financial concerns in determining whether to incorporate additional safety features

into its product" constitutes a "unilateral basis" for establishing that the defendant acted

recklessly.  On the contrary, the Phillips II Court merely considered such financial considerations

to be part of "the myriad elements that affect decisions a for-profit entity must make in

manufacturing and marketing commercial products." Id.  So too here, the fact that Defendants

may have taken into account the cost of adding child safety features when designing and

---

[11] This dispute appears to primarily concern whether the UL requirements Defendants complied with were the most
up-to-date version of the UL requirements. (Compare CED Report at 6-14 with Tipton Report II 1-2.)

manufacturing the MailMate Paper Shredder is not in and of itself a reason to permit Plaintiffs' punitive damages claim to move forward.

Thus, the Court concludes that as a matter of law, Plaintiffs have not adduced evidence sufficient to establish that Defendants' conduct was so outrageous so as to support an award of punitive damages.  Summary judgment is therefore granted.

## IV.      <u>CONCLUSION</u>

For the reasons set forth above, Defendants' Motion for Summary Judgment is **GRANTED** as to Plaintiffs' strict liability-inadequate instructions or warnings (Count II), breach of express warranty (Count III), breach of implied warranty (Count IV), and punitive damages (Count I-V) claims.  Defendants' Motion is **DENIED** as to Plaintiffs' negligence (Count I) and strict liability-design defect (Count II) claims.

An appropriate order follows.